IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| CHARLES A. JAY, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| v. | )     CASE NO.  2:17-CV-00369-C |
| | ) |
| AUBURN UNIVERSITY, | ) |
| | ) |
|     Defendant. | ) |

## ORDER

This matter is before the Court on Defendant Auburn University's ("Auburn") motion for summary judgment (Doc. 113), pro-se Plaintiff[1] Charles A. Jay's response in opposition (Doc. 116), and Auburn's reply (Doc. 121).  Having duly considered the evidentiary record and the parties' briefs, with no hearing being necessary, the Court deems it proper to **GRANT** Auburn's motion.

I.      **Background[2]**

This case arises from Auburn's election not to hire Jay in 2017 for the position of a Tech I/II at its Rural Studio in Hale County, Alabama.  Jay originally filed this action alleging disability discrimination in August 2017, *see* Doc. 1, and filed the operative Third Amended Complaint in June 2018.  Doc. 61.  The parties engaged in extensive discovery, and after the

---

[1] The Court acknowledges that Jay, who does not have the benefit of counsel, is to be given some leniency as to the construction of his pleadings; the Court, however, does require him to conform to all procedural rules, including rules of evidence.  *Albra v. Advan, Inc.*, 490 F.3d 826, 829 (11th Cir. 2007).

[2] The Court deems uncontroverted material facts to be admitted solely for the purposes of deciding the motion for summary judgment. S.D. Ala. L.R. 56(d); *see also Moreno v. Serco Inc.*, 734 F. App'x 656, 658 (11th Cir. 2018) (citing *Reese v. Herbert*, 527 F.3d 1253, 1268 (11th Cir. 2008)).

close of discovery, Auburn moved for summary judgment on Jay's sole claim alleging violation of the Rehabilitation Act, 29 U.S.C. §§ 794 *et seq.*

A.    **Jay's Background and Claimed Disabilities**

Jay has held various jobs, including the founding of a one-man electrical company known as "Dixie Electric," and has worked in the general Hale County area as an electrician and handyman from approximately 1992 through 2014.  Jay Dep., Doc. 113-1, 56:5–7, 69:8–18.  Jay worked as the manager of the Hale County Water Authority from about 1999–2000; he also worked as a self-employed catfish farmer until the mid-2000s.  *Id.* at 89:13–16, 128:22–129:5, 129:16–23.  From 2010 through 2014, Jay worked for SunSouth in Demopolis, Alabama in the Parts Department and the Large Equipment Services Department.  *Id.* at 89:6–10.

In April 2001, Jay fell off a ladder while cutting down a large tree limb on his property and broke his neck.  Jay Dep., Doc. 113-1, 104:7–19.  Dr. Rick McKenzie performed surgery to repair the damage.  *Id.* at 107:3–13.  Jay last saw Dr. McKenzie in April 2016.  *Id.* at 237:7–12.  Despite this injury, Jay does not experience substantial limitations to any major life activity.  *Id.* at 161:2–3 ("My neck, I have no problem.").

In 2010, Jay fell at home and damaged his left shoulder.  Jay Dep., Doc. 113-1, 109:21, 110:15–111:3.  Because he did not have insurance at the time, he did not seek medical attention.  *Id.* at 111:6–7.  Once he began work at SunSouth and had insurance, Jay saw a doctor for his pre-existing shoulder injury.  *Id.* at 111:12–23.  Dr. Lucie King performed surgery on Jay in November 2011 to repair a rotator cuff.  In surgery, she discovered that many of the tendons had been damaged.  *Id.* at 116:9–19.  Jay is able to use his left arm and shoulder without substantial

limitations.   *See id.* at 116:1–6, 160:22–161:5.   He has not sought medical treatment or rehabilitation therapy for his shoulder since 2014.[3]

Jay and his wife Laurie began marriage counseling and individual therapy with Marguerite Malone, Ph.D., a clinical psychologist, in January 2004 and continued until their separation in 2006.  Jay Dep., Doc. 113-1, 240:3–23.  Malone diagnosed Jay with post-traumatic stress disorder ("PTSD").   *Id.*  Jay does not take any medication for PTSD and has not sought any additional treatment since 2006.  *Id.* at 265:20–266:2.  Jay describes his symptoms of PTSD as "uncontrollable anger" and the feelings he experiences when he believes he has been disrespected.  *Id.* at 285:4–23.  Jay has not identified any major life activity that his alleged PTSD substantially limits.  Jay noted that he "had gotten good to where I could handle it [the anger] until this lawsuit."  *Id.* at 286:16–20.

Despite the injuries he has suffered in the past, Jay is able to care for himself, to walk, to bend, to stand, to climb, to crawl, to learn, to think, to read, to climb stairs, and to perform manual tasks, including labor-intensive tasks.  Jay Dep., Doc. 113-1, 220:23–222:23 ("I can do everything, yes, ma'am, I'm normal.").  Jay can dress himself without substantial limitation, Jay Dep., Doc. 121-1, 162:13–23, and can eat without substantial limitation, Jay Dep., Doc. 113-1, 289:22–290:10.

## B.     The Rural Studio

The Rural Studio is an off-campus design-build program of the School of Architecture, Design and Construction of Auburn University.  *See* Freear Decl., Doc. 113-2, ¶ 4.  The Rural Studio was founded in 1993 by D.K. Ruth and Samuel "Sambo" Mockbee in Hale County.  *Id.* The program provides Third and Fifth Year architecture students with a hands-on educational

---

[3] Jay fell a second time and reinjured the same shoulder.  *See id.* at 114:1–17.  Although he has some pain, he has no substantial mobility limitations and can use a chain saw, split firewood, and perform other manual tasks.  *See id.* at 225:1–226:5, 227:4–13, 228:6–23.

experience.  The projects focus on sustainability by reimagining, reusing, and remaking building materials.  The Rural Studio focuses largely on community-oriented work in the West Alabama Black Belt region.  Students, with the guidance of faculty and staff, design and construct housing and community projects.  *Id.*  Students are supervised by faculty and staff, including Construction Supervisor Johnny Parker and Tech I/II Mason Hinton.  *Id.* at ¶ 5.  Mr. Parker and Mr. Hinton are trained in construction, electricity, plumbing, heavy equipment, welding, and other trade skills to support the Rural Studio projects.  They directly supervise and teach the students how to build the designs they have made.  In addition, Mr. Parker, Mr. Hinton, and the supporting faculty members ensure the job sites are safe and meet applicable code provisions. *Id.*

Beginning in 1993, Jay through Dixie Electric began working as an independent contractor with the Rural Studio, and he worked with Professor Mockbee until approximately 1999.  Jay Dep., Doc. 113-1, 70:12–71:9.  Jay was never an employee of Auburn or its affiliates. *Id.* at 84:11–13.  Jay and Professor Mockbee cultivated a friendship, and Jay was known to visit Mockbee at the Rural Studio from time to time, even after Jay no longer worked on Rural Studio projects.  Freear Decl., Doc. 113-2, ¶ 12.

Professor Mockbee served as the Director of the Rural Studio until his death in December 2001.  Freear Decl., Doc. 113-2, ¶ 12.  Professor Mockbee hired Andrew Freear in 2000 as a Visiting Assistant Professor.  Professor Freear became the Co-Director of the Rural Studio in 2003.  Professor Freear served in this capacity until 2007, when he was made the Director.  *Id.* at ¶ 3.  Professor Freear was on sabbatical in Florence, Italy from August 2016 through August 2017.  *Id.* at ¶ 6.  He then had a fellowship at Harvard University from August 2017 through May 2018.  *Id.*  He resumed his position as the Director in August 2018.  *Id.*  During his two-year leave of absence from the Rural Studio, he extracted himself from the day-to-day

operations, including any hiring decisions.  *Id.* at ¶ 7.  In Professor Freear's absence, Professor

Xavier Vendrell assumed the role of Acting Director.  Vendrell Decl., Doc. 113-3, ¶ 3.

### C.   The Tech I/II Hiring Decision in 2016–2017

In the fall of 2016, Auburn advertised a vacancy at the Rural Studio for a Tech I/II

position.  Jay Dep., Doc. 113-1, 147:7–12; Position Announcement, Doc. 113-1, p. 38.  The

minimum qualifications required "[b]asic knowledge of construction, electrical, and plumbing

codes and [the] ability to perform construction, plumbing, [and] electrical jobs" as well as the

"ability to operate heavy equipment."  Position Announcement, Doc. 113-1, p. 38.  The desired

qualifications "include the ability to resolve routine problems independently and provide

instruction to students on construction techniques[.]"  *Id.*

Auburn followed its general procedure for filling this vacancy.  Vendrell Decl., Doc. 113-

3, ¶ 5.  The Office of Human Resources reviews the "application and supporting documentation

to assess whether the potential candidate meets the posted minimum qualifications for the job."

Thompson Decl., Doc. 113-4, ¶ 5.  If the applicant passes this first stage, the application

materials are sent for review to those responsible for the hire in the department filling the

position.  *Id.*

Jay applied for the Tech I/II position in December 2016.  Jay Dep., Doc. 113-1, 167:2–

13.  On his application, he listed three prior jobs for his work experience: (1) self-employed

catfish farmer, (2) tractor mechanic at SunSouth, and (3) electrician, plumber, and "Sambo

Assistant" for Auburn.  *Id.* at 166; Jay Application, Doc. 113-1, p. 40.  He did not list any

specific job duties for any of these jobs and did not detail the basis for his qualifications or his

experience.  *See* Jay Application, Doc. 113-1, pp. 39–42.  Jay also did not list any individual

references for Auburn to contact and instead broadly stated his references as "Rural Studio

affiliates 94–99." *Id.* at p. 41. The only individual named on his entire application was Sambo Mockbee, who had been deceased for 15 years. *Id.*

As part of the application process, Jay voluntarily self-identified as "disabled." Jay Dep., Doc. 113-1, 198–99; Voluntary Demographic Information, Doc. 113-1, p. 43. This information is kept separate from the application. *Id.* Only the Office of Human Resources and Auburn's Affirmative Action/Equal Opportunity Office have access to an applicant's voluntary demographic information. Thompson Decl., Doc. 113-4, ¶ 6. The faculty and staff in the department conducting a search, including at the Rural Studio, do not ever have access to the self-identifying demographic information for applicants to positions within the department. *Id.*

After Auburn's Office of Human Resources determined Jay met the minimum qualifications for the Tech I/II position, his application was forwarded to the search committee at the Rural Studio. Once Jay received notification that his application had entered the next stage, he called the Office of Human Resources in Auburn and spoke with Chris Thompson, Manger of Employment Administration. Thompson Decl., Doc. 113-4, ¶ 9. During that phone call, Jay informed Mr. Thompson that he received disability benefits, but Jay never indicated what his disability was and did not ask for any accommodation or assistance with the application process. *Id.*; *see also* Jay Dep., Doc. 113-1, 169:9–19, 182:5–13; Jay Dep., Doc. 121-1, 171:13–172:11. Because Jay did not request assistance or an accommodation (or indicate any was needed), no action was required outside Human Resource's usual processing of applications. Thompson Decl., Doc. 113-4, ¶ 9.

Because the new employee in the Tech I/II role would report to Johnny Parker, the Construction Supervisor, Mr. Parker participated in the search process. Parker Decl., Doc. 113-5, ¶ 6. Mr. Parker and Professor Vendrell individually reviewed each application they received

from Auburn's Human Resources office.   Vendrell Decl., Doc. 113-3, ¶ 5.   In total, they reviewed six applications, including Jay's.  *Id.*

After independently reviewing the applications, Professor Vendrell and Mr. Parker met and conferred to decide who to interview.   Vendrell Decl., Doc. 113-5, ¶ 5.   They mutually selected three applicants to be interviewed but did not select Jay.  *Id.* at ¶¶ 5–6.   Professor Vendrell and Mr. Parker agreed that Jay's application did not demonstrate that he had relevant experience.  *Id.* at ¶ 6.   They also were unable to contact any references.  *Id.*; *see also* Parker Decl., Doc. 113-5, ¶ 8.

Professor Vendrell did not know Jay at the time of the hiring process.   Vendrell Decl., Doc. 113-3, ¶ 8.   He had no knowledge that Jay had self-identified as disabled.  *Id.* Mr. Parker had met Jay around Newbern but did not know that Jay self-identified as disabled in 2016. Parker Decl., Doc. 113-5, ¶ 10.   Jay, however, contends that at some time prior to his 2016 application, he told Mr. Parker about his disability.  *See* Jay Dep., Doc. 113-1, 269:22–270:1 ("…and Johnny Parker knows I'm disabled.  I've talked to him on several occasion."), 276:11–20.[4]

Four Rural Studio employees participated in the interviews of the top three candidates: Professor Vendrell; Mr. Parker; Mr. Edward "Rusty" Smith, the Associate Director of the Rural Studio; and Mr. Stephen Long, an Instructor with the Rural Studio.  Vendrell Decl., Doc. 113-3, ¶ 9.[5] The search committee determined that Mason Hinton was the best candidate for the Tech I/II position because of his relevant work experience and because of his educational credentials,

---

[4] Jay admits that Mr. Parker might not recall their conversations and cannot specifically say how, when, or what details he shared with Mr. Parker.  *See generally id.* at 278–279 ("Now, whether or not they remember it… I don't care.").

[5] *See also* Smith Decl., Doc. 113-6, ¶ 4; Long Decl., Doc. 113-7, ¶ 4.

which indicated his ability to take on and learn additional skills.  *Id.* Mr. Hinton accepted the job and continues to work at the Rural Studio.  *Id.*

## II.    Standard of Review

Federal Rule of Civil Procedure 56(a) provides summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  The party seeking summary judgment bears "the initial burden to show the district court, by reference to the materials on file, that there are no genuine issues of material fact that should be decided at trial."  *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).  The moving party may meet its burden in either of two ways: (1) by "negating an element of the non-moving party's claim" or (2) by "point[ing] to materials on file that demonstrate that the party bearing the burden of proof at trial will not be able to meet that burden."  *Id.*

"If the party moving for summary judgment fails to discharge the initial burden, then the motion must be denied and the court need not consider what, if any, showing the non-movant has made."  *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 (11th Cir. 1993); *accord. Mullins v. Crowell*, 228 F.3d 1305, 1313 (11th Cir. 2000); *Clark*, 929 F.2d at 608.  "If, however, the movant carries the initial summary judgment burden …, the responsibility then devolves upon the non-movant to show the existence of a genuine issue of material fact."  *Id.*  "If the nonmoving party fails to make 'a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof,' the moving party is entitled to summary judgment."  *Clark*, 929 F.2d at 608 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (footnote omitted)); *see also* Fed. R. Civ. P. 56(e) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may … consider the fact undisputed for purposes of the motion….").

The trial court's function is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The mere existence of a factual dispute will not automatically necessitate denial; rather, only factual disputes that are material preclude entry of summary judgment. *Lofton v. Sec'y of Dep't of Children & Family Servs.*, 358 F.3d 804, 809 (11th Cir. 2004). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50 (internal citations omitted). In deciding a motion for summary judgment, "[t]he evidence, and all reasonable inferences, must be viewed in the light most favorable to the nonmovant"—here, Jay. *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003).

### III.    Auburn's Objections to Jay's Medical Records

Before addressing the substantive portions of this Order, the Court turns to Auburn's objections to certain evidence Jay submitted with his response. In its reply, Auburn objected to three exhibits Jay attached to his response, namely Exhibits B, C, and D (Doc. 116, pp. 62–70). Rule 56(c)(2) provides that a "party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56. These exhibits comprise Jay's medical records from Dr. Malone (Ex. B), Dr. King (Ex. D), and DCH Regional Medical Center (Ex. C).[6] Auburn contends these records cannot be reduced to admissible form and are thus hearsay. "The general rule is that inadmissible hearsay 'cannot be considered on a motion for summary judgment.'" *Macuba v. Deboer*, 193 F.3d 1316, 1323 (11th Cir. 1999) (quoting *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990)). The Eleventh Circuit has "restated the general rule to hold that a district court may consider a hearsay

---

[6] Exhibit C is not a copy of the actual records. Rather, it is a letter from Auburn's attorney to Jay that references some 285 pages of records from DCH, which were obtained in response to a subpoena. *See* Doc. 116, p. 67.

statement in passing on a motion for summary judgment if the statement could be 'reduced to admissible evidence at trial' or 'reduced to admissible form.'" *Id.* (citations omitted).

Hearsay is an out-of-court statement offered to prove the truth of the matter asserted. Fed. R. Evid. 801(c). Federal Rule of Evidence 803(4) makes an exception for statements made for the purpose of a medical diagnosis or treatment, but this exception is understood to apply to out-of-court statements made by the plaintiff, and not to such statements made by the treating physician. *See Rogers v. S. Star Logistics, Inc.*, No. 3:14–CV–179–WHA–WC, 2015 WL 3440335, at *3 (M.D. Ala. May 28, 2015) ("Statements related to the Plaintiff's injuries would only be hearsay if they were the diagnoses communicated *by a physician* to either Plaintiff.  To the extent the declarant is one of the physicians, the Plaintiffs cannot testify as to the diagnoses.") (emphasis added).  Jay's medical records from Dr. Malone (Exhibit B) and Dr. King (Exhibit D) are inadmissible hearsay because they are diagnoses or treatment notes from a treating physician and not merely Jay's own experience of the symptoms.  The declarants are the physicians (and not Jay) and were not disclosed as expert witnesses under the scheduling order.[7] *Id.*; *see also Russell v. Hendrix*, No. 16–1074–WS–N, 2017 WL 4477277, at *7, *7 n. 12 (S.D. Ala. Oct. 6, 2017) (noting that the medical records, to which the defendant did not object, were most likely hearsay not reducible to admissible form) (citing *Shaw v. City of Selma*, 241 F. Supp. 3d 1253, 1264 (S.D. Ala. 2017) (the plaintiff could not reduce hearsay to admissible form at trial because he failed to disclose the declarant as a witness)).  Further, Jay is attempting to utilize these medical records to prove the truth of the matter asserted—that he is disabled—and not for some other permissible purpose.  Jay's medical records from Dr. Malone and Dr. King are thus not proper for consideration at the summary judgment stage, just as they would not be at trial because they are hearsay and because these physicians were not timely identified as experts.

---

[7] The Scheduling Order set November 15, 2018 for disclosure of Jay's expert witnesses. Doc. 77, pp. 2–3. Jay disclosed no experts.

Jay also attempts to include the medical records Auburn received in response to a subpoena to DCH Regional Medical Center. *See* Exhibit C, Doc. 116, p. 67. These medical records, made by hospital staff, including intake personnel, nurses, and treating physicians, cannot be reduced to admissible form at trial and thus cannot be considered on the motion for summary judgment. *See Rogers*, 2015 WL 3440335, at *3; *Russell*, 2017 WL 4477277, at *7, *7 n. 12.[8]

## IV.    Analysis of Jay's Rehabilitation Act Claim

Jay's claim before this Court is that Auburn violated the Rehab Act when it did not hire him because he is disabled, despite the fact that he was the most qualified candidate. Jay further alleges that Auburn failed to interact after he self-identified as disabled and allegedly requested to speak to someone at the Rural Studio about his disabilities.

The Rehab Act prohibits federally funded agencies from discriminating in employment against individuals with disabilities. *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005). "The standard for determining liability under the Rehabilitation Act is the same as that under the [Americans with Disabilities Act ("ADA")]." *Sutton v. Lader*, 185 F.3d 1203, 1207 n. 5 (11th Cir. 1999); *see* 29 U.S.C. § 791(f). "To establish a prima facie case of discrimination under the Rehabilitation Act, a plaintiff must show that (1) he has a disability, (2) he was otherwise qualified for the position, and (3) he was subjected to unlawful discrimination as the result of his disability." *Boyle v. City of Pell City*, 866 F.3d 1280, 1288 (11th Cir. 2017). "To establish the third element, an individual must show that he has suffered an adverse employment action because of his disability." *Ellis*, 432 F.3d at 1326. However, "[i]t is not enough for a plaintiff to

---

[8] The Court sustains Auburn's further objections regarding the statements about and references to these medical records exhibits included in Jay's response in the following paragraphs: 27–30, 33, 35–37, 39–40, 43–44, 47, and 65. To the extent Jay includes in these paragraphs his personal impressions about the alleged medical conditions (e.g., ¶ 30 ("Ma'am, it hurt so bad…")), those statements are not hearsay.

demonstrate that an adverse action was based partly on his disability.   Rather, under the Rehabilitation Act, a plaintiff must prove that he suffered an adverse employment action '*solely by reason of*' his handicap."   *Id.* (quoting *McNely v. Ocala Star-Banner Corp.*, 99 F.3d 1068, 1074 (11th Cir. 1996)); 29 U.S.C. § 794(a)).

Under the Rehab Act, by way of the ADA, covered entities are prohibited from "discriminat[ing] against a qualified individual on the basis of disability in regard to job application procedures [and] hiring[.]"   42 U.S.C. § 12112(a).   A "qualified individual" is defined as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."   *Id.* § 12111(8).

Courts "apply the three-part burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), to claims of discrimination under the Rehabilitation Act that are based on circumstantial evidence."   *Center v. Sec'y, Dep't of Homeland Sec., Customs, and Border Prot. Agency*, 895 F.3d 1295, 1303 (11th Cir. 2018).   Jay must first establish a prima facie case.   *Id.*   "If he does so, the 'burden … shift[s] to [the employer] to articulate a legitimate, nondiscriminatory reason for [the action].'"   *Id.* (quoting *Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1193 (11th Cir. 2004).   The burden then returns to Jay, who must demonstrate that the proffered reason(s) for not hiring him are a mere pretext for discrimination.   *Id.*

A.     **Jay cannot establish a prima facie case because he is not disabled within the meaning of the Rehab Act.**

The Rehab Act defines "disability" to mean "a physical or mental impairment that substantially limits one or more major life activities."   29 U.S.C. § 705(9)(B) (cross-referencing 42 U.S.C. § 12102).   Major life activities mean functions such as "[c]aring for oneself, performing manual tasks, seeing, hearing, walking, standing, sitting, reaching, lifting, bending,

speaking, breathing, learning, reading, concentrating, thinking, communicating, interacting with others, and working." 29 C.F.R. § 1630.2(i)(1)(i). "An impairment 'substantially limits' such an activity only if it renders the individual unable to perform 'a major life activity that the average person in the general population can perform' or significantly restricts the 'condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.'" *Branscomb v. Sec'y of the Navy*, 461 F. App'x 901, 904 (11th Cir. 2012) (quoting *Chanda v. Engelhard/ICC*, 234 F.3d 1219, 1222 (11th Cir. 2000)).

In this litigation, Jay has identified three impairments that allegedly substantially limit at least one major life activity: his past neck injury, his past shoulder injury, and the diagnosed PTSD. Yet Jay's own testimony undercuts his contention that he is substantially limited in any major life activity. The record shows Jay suffered a neck injury in 2001 and a shoulder injury in 2010. *See* Jay Dep., Doc. 113-1, 107:3–13, 237:7–12. Jay damaged his left shoulder when he fell in 2010 and had surgery in November 2011. *Id.* at 111:22–23, 116: 9–19; Pl.'s Resp. to Def.'s Interrog., Doc. 113-1, pp. 47, 49.

Despite these injuries, Jay is able to care for himself, dress himself, see, hear, eat, sleep, walk, stand, bend, balance, speak, breathe, learn, read, think, and perform manual tasks—including physical labor—without any significant issues. Jay Dep., Doc. 113-1, 220:23–222:23 ("I can do everything, yes, ma'am, I'm normal."). When asked about any limitations concerning his shoulder, Jay unequivocally stated, "[t]here's nothing I can't do" except raise his left arm completely above his head and carry over 100 pounds without experiencing minor pain. *Id.* at 160:22–161:5. In short, Jay has provided no evidence that he is substantially limited in any way, and certainly not in any major life activity, due to his alleged physical impairments. In fact, Jay

has stated that he is "normal" and able to perform basic, everyday tasks. When discussing his shoulder and neck injuries, Jay confirmed his lack of limitations:

> Q.   You can lift over a hundred pounds?
> A.   Yes, ma'am, I can flip this table over.
>
> Q.   No problem?
> A.   No problem. […]
>
> Q.   Look, we'll just talk through it […] and you just tell me what you can do, okay? […]
> A.   There's nothing I can't do, ma'am, except maybe when I get right in here with weight on my shoulder I start having trouble, but other than that, no. My neck, I have no problem.
>
> Q.   No problem.
> A.   I can go to work.

Jay Dep., Doc. 113-1, 160:4–161:5.  When Jay has some difficulty in his left shoulder (e.g., when raising it to a certain point above his head), he simply will "do it [the task] with this [other] hand" without an issue. Jay Dep., Doc. 121-1, 162:17–19.

Moreover, Jay provided incontrovertible evidence that his neck and shoulder in no way limit major life activities.  Jay demonstrated his abilities by recording himself in 2018 climbing a ladder and using a chainsaw and an axe to cut a branch off a tree and to chop firewood.  Jay Dep., Doc. 113-1, 224:7–225:21.  Indeed, Jay chops wood weekly when the weather is cold.  He noted that the chainsaw he used as recently as 2018 is the same chainsaw he has used and owned for years and is even the same chainsaw he was using when he injured his neck in 2001.  This chainsaw weighs between 25 and 30 pounds, and Jay has carried the chainsaw without issue in one hand (including his left hand) while climbing up and down a 15-foot extension ladder.  *Id.* at 227:4–13.

In short, neither Jay's shoulder injury nor his neck injury has substantially limited any major life activity, and thus neither claimed injury qualifies as a disability under the Rehab Act. *See Garrett v. Univ. of Ala. At Birmingham Bd. of Trs.*, 507 F.3d 1306, 1311 (11th Cir. 2007).

He continued to work at SunSouth and on his family catfish farm after both injuries.  *See* Jay Dep., Doc. 113-1, 103:10–104:19, 109:20–111:15.  He did not testify that he has experienced any ongoing or permanent substantial limitations to any major life activity as a result of either injury.

Jay further contends he is disabled within the meaning of the Rehab Act because he was diagnosed with PTSD during the course of counseling sessions he attended with his wife.  Jay Dep., Doc. 113-1, 240:3–6.  It is unclear whether Jay continues to suffer from PTSD or any symptoms thereof.  Jay contends that he suffers from PTSD in the form of "panic attacks, recurrent nightmares, obsessive thoughts and flashbacks of the events."  *Id.* at 284:13–15.  He describes these symptoms as "uncontrollable anger" and states he has experienced them periodically since about 2002.  *Id.* at 285:22, 286:7–20.  Jay noted that he "had gotten good to where I could handle it [the anger] until this lawsuit."  *Id.* at 286:16–20.  Jay cannot, however, weaponize the lawsuit he filed by blaming it for the aggravation of his previously controlled symptoms.  While Jay has suffered hardships in his life and may experience episodes of sadness or "uncontrollable anger," these symptoms do not meet the definition of a "disability" under the Rehab Act.  *See Flood v. City of Jacksonville*, 263 F. Supp. 3d 1213, 1227 (N.D. Ala. 2017) (granting motion to dismiss on a Rehab Act claim asserting a mental impairment because "no facts are pled which plausibly allege that [the plaintiff's] 'mental problems' substantially limited one or more of his major life activities."); *Odom v. Barnhart*, No. CV04-CO-02363-S, 2006 WL 8437687, at *8 (N.D. Ala. Jan. 2006) (stating "merely being diagnosed with an impairment is not enough to establish that plaintiff has a qualifying disability under the Rehabilitation Act.  Plaintiff must also show that her impairment substantially limits her ability to perform one or more major life activities.") (internal citation omitted).

Even evaluating the evidence regarding Jay's alleged physical and mental impairments in a light most favorable to him, it is clear that Jay's past physical injuries to his neck and shoulder and his alleged PTSD do not rise to the level of a disability as defined by the Rehab Act.  The evidence is undisputed that Jay is able to perform all major life activities without substantial limitations.  Accordingly, Jay is not disabled within the meaning of the Rehab Act and, thus, cannot support his claim as asserted.  *See Hunter v. U.S. Postal Service*, 535 F. App'x 869, 872–73 (11th Cir. 2013) (citing *Cash v. Smith*, 231 F.3d 1301, 1305 (11th Cir. 2000)); *see also Garrett*, 507 F.3d at 1310 (noting that proving the existence of a disability is a core element of a discrimination claim under the Rehab Act).  Jay falls short of meeting his burden, and for these reasons, Auburn is entitled to summary judgment in its favor.

**B.**  **Even if Jay were disabled, Auburn has identified multiple legitimate, nondiscriminatory, nonpretextual grounds for not selecting him for the position.**

Even if Jay were able to meet his burden in establishing a prima facie case, his claim would still fail because Auburn has presented legitimate, nondiscriminatory reasons for not hiring Jay for the Tech I/II position.  The record demonstrates the search committee did not select Jay for two reasons:  First, they believed his application materials did not demonstrate relevant experience to the degree demonstrated by the other applicants, and second, Jay did not list identifiable references with contact information on his application.  Moreover, the candidate who was hired (Mason Hinton) was simply a better, more qualified candidate.  Unlike Jay, Mr. Hinton detailed his relevant experience on his application and provided the names and contact information for three references.  Thompson Decl., Doc. 113-4, ¶ 11; Hinton Application, Doc. 113-4, pp. 9–11.

On his application for the Tech I/II position, Jay listed three previous jobs in the "work experience" section: (1) self-employed catfish farmer, (2) tractor mechanic at Sunsouth, and (3)

"Electrician Plumber and Sambo Assistant" (sic) at Auburn.  Jay Application, Doc. 113-1, p. 40.
He did not provide any details regarding his "duties" in the first job; for the second job he simply
wrote "Repair Ag. Equipment"; and for the most relevant work experience, Jay simply listed the
names of projects at the Rural Studio.  *Id.*   In the eyes of the search committee, Jay did not
provide detail to demonstrate he had performed job duties that were relevant to the advertised
Tech I/II position.  *See* Position Announcement, Doc. 113-1, p. 38 (listing relevant trades as
"mechanics, welding, plumbing, electrical, and construction"); Parker Decl., Doc. 113-5, ¶ 8;
Vendrell Decl., Doc. 113-3, ¶ 6.  The only arguably relevant experience listed on the application
was as an electrician and plumber at different Rural Studio projects in the mid-1990s,
approximately 20 years prior to his application.  Even that listing was lacking, however, because
Jay did not specify what his duties were or exactly what tasks he performed on the "Haybale
house[,] Butterfly house[,] Dorothy's kitchen[, or the] Morisette house etc."  *See* Jay
Application, Doc. 113-1, p. 40.  Although Jay stated he had previously worked for Auburn, he
stated only that he had been "[w]ith Sambo from day 1" and stated his title or department as
"[w]orked with and loved Professor Sambo Mockbee."  Jay Application, Doc. 113-1, p. 39.  Yet
this statement does not provide any relevant information about Jay's skills, training, or
experience for the advertised position.

　　　　As to references, Jay did not provide any identifiable reference or otherwise provide the
contact information for any of his prior supervisors.  Instead, he listed "Rural Studio affiliates
94–99."  *Id.* at p. 41.  The only Rural Studio affiliate Jay mentions by name in the entirety of the
application is Professor Mockbee, who had been deceased since December 2001 (approximately
15 years at the time of Jay's application).  *See id.* at 39–42.  The search committee determined
that Jay had not listed any specific references and had not provided the contact information for

anyone who could attest to his ability to perform the tasks and duties of the Tech I/II position. *See* Vendrell Decl., Doc. 113-3, ¶ 6; Parker Decl., Doc. 113-5, ¶ 8.

The search committee's evaluation that Jay's application, including the lack of available references, was subpar is a legitimate, nondiscriminatory reason not to hire Jay.  As such, Jay cannot show that the committee's decision not to interview him was solely based on his disability.  *See Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005).

### C.   Jay cannot demonstrate Auburn's reasons for not selecting him are pretextual.

Jay cannot demonstrate that the decision to hire Mr. Hinton was pretext to discriminate against Jay solely because of his disability.  Jay may disagree with Auburn's assessment of his application, but that disagreement cannot support a finding of pretext.  In an attempt to rebut Auburn's legitimate, non-discriminatory reasons for not selecting him, Jay argues that he "is" the Rural Studio and that the search committee simply needed to "look in the mirror" to ascertain Jay's references and his qualifications.  Jay Dep., Doc. 113-1, 218:6–15; Doc. 116, p. 24, ¶ 68. But those involved in the search did not independently know of Jay's prior work with Sambo Mockbee at the Rural Studio (from approximately 20 years prior), and his application provided, at best, exiguous details about his prior work experience with the Rural Studio.  *See* Doc. 116, p. 9, ¶ 16; *see also* Freear Decl., Doc. 113-2, ¶ 12; Parker Decl., Doc. 113-5, ¶ 10; Vendrell Decl., Doc. 113-3, ¶ 6.

Jay has no evidence to meet and rebut head-on Auburn's legitimate, non-discriminatory reasons for not selecting him.  He cannot show that the proffered reasons are false.  *Skotnicki v. Bd.  of Trs. of The Univ. of Alabama*, No. 2:11–CV–03497–RDP, 2014 WL 3891973, at *9 (N.D. Ala. Aug. 8, 2014) ("A reason is not pretext for discrimination 'unless it is shown both that the reason was false, and that discrimination was the real reason.'") (quoting *St.  Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)), *aff'd* 631 F. App'x 896 (11th Cir. 2015).  Jay is unable to

rebut these legitimate reasons as pretextual because they are true and based on the subjective, good-faith belief that another candidate was more qualified for the position. Accordingly, Jay cannot overcome the legitimate, nondiscriminatory reasons Auburn has offered to support its decision not to hire Jay. Summary judgment is warranted.

> **D.      Jay's claim necessarily fails because he never requested an "interaction."**

Finally, Jay's claim also fails because he did not request any assistance, accommodation, or "interaction" with Auburn with regards to his job application for the Tech I/II position. It is undisputed that Jay submitted his application for the job before he called or otherwise reached out to Auburn. Jay Dep., Doc. 113-1, 168:21–169:19 (stating that Jay called Chris Thompson in Auburn's Human Resources Office after he had submitted his application); Thompson Decl., Doc. 113-4, ¶ 9. While Jay's summary judgment response indicates that he requested assistance and that Auburn's "failure to interact" is "in total and complete non-compliance of the Rehab Act," Doc. 116, ¶¶ 24, 62, he has failed to show that he actually requested an accommodation with the application process or that he requested any interaction that would have materially impacted the processing of his application. *See* Thompson Decl., Doc. 113-4, ¶ 9.

Rather, Jay's testimony demonstrates that, because he was using a mobile phone with a damaged screen to complete the application, he might have needed assistance with access to a better electronic device when completing the application. *See* Jay Dep., Doc. 113-1, 167:2–13 ("I was asking for help for my application to further explain my application because … I did not have the internet and my wife's phone screen was half gone…."). Despite this hardship—which has nothing to do with a physical or mental disability—Jay completed the application and successfully submitted it to Auburn within the deadline. *Id.* at 167:9–10. Indeed, his application continued through the standard Auburn process. It was reviewed by Human Resources to determine that he met the minimum qualifications for the Tech I/II position and then forwarded

to the search committee at the Rural Studio for review.  Thompson Decl., Doc. 113-4, ¶ 9; Jay

Dep., Doc. 121-1, 173:2–15.  At no point in time did Jay request any assistance with completing

or submitting his application:

> Q.  Just a minute, please, sir. When you called Mr. Thompson, that was Chris Thompson at Auburn University Human Resources?
> A.  Mr. Thompson, I guess, yes. […]
>
> Q.  Okay, and when you called him you explained to him that you had already applied for the position, right?
> A.  Correct. […]
>
> Q.  Did you ask Mr. Thompson for help completing or submitting the application?
> A.  I had already completed and submitted the application […] *I did not ask Mr. Thompson for any specific help* except for communication. […]
>
> Q.  Okay, well, let's back up a minute. When you contacted Mr. Thompson as we just listened to on the audio recording that you made, you did not ask him for any assistance on the application or for your application for the Tech I/Tech II position, right?
> A.  I did not ask Mr. Thompson for any assistance on my application. That is correct.

Jay Dep., Doc. 113-1, 169:9–19, 182:5–13 (emphasis added); Jay Dep., Doc. 121-1, 171:13–

172:11.  Further, Jay never expressed any need for accommodations—with the application or

otherwise—when he spoke to Mr. Thompson.  Jay Dep., Doc. 113-1, 184:15–186:18; Thompson

Decl., Doc. 113-4, ¶ 9.  Rather, he called Mr. Thompson to inquire if someone from the Rural

Studio would be contacting him so Jay "could explain to them about my disability and *any help

that I would need*. I may need *future* medical appointments, I may need to get my shoulder

replaced."  Jay Dep., Doc. 113-1, 184:1–7 (emphasis added).   Thus, Jay did not seek

accommodations with the application process. Rather, he sought to inform the search committee

of what accommodations he would need if he were selected for the job.

As is made clear from the record, Jay never requested assistance or an accommodation

with the application process.  Auburn's "duty to provide a reasonable accommodation is not

triggered unless a specific demand for an accommodation has been made."  *Gaston v.*

*Bellingrath Gardens & Home, Inc.*, 167 F.3d 1361, 1363 (11th Cir. 1999) ("We have previously held that a plaintiff cannot established a claim under the Rehabilitation Act alleging that the defendant discriminated against him by failing to provide a reasonable accommodation *unless he demanded such an accommodation.*") (emphasis added).   Because Jay never requested any accommodations, Auburn's duty to evaluate an accommodation was never triggered. Accordingly, Jay's "failure to interact" argument does not move the ball on his failure-to-hire disability discrimination claim, and Auburn is entitled to summary judgment.

## V.     Conclusion

For the reasons stated above, the Court **GRANTS** Auburn's motion for summary judgment (Doc. 113).   A separate Judgment will be entered.

**DONE** and **ORDERED** this the 20th day of May 2019.

s/WILLIAM E. CASSADY
**UNITED STATES MAGISTRATE JUDGE**